## Shroyer's Estate

*William B. Parshall* and *Paul E. Fike*, for exceptant.
*E. D. Brown* and *Wade K. Newell*, for widow.

MATTHEWS, P. J., July 12, 1943. — Samuel L. Shroyer, late of Stewart Township, died December 4, 1942, intestate, leaving to survive him as his only heirs at law a widow, Margaret E. Shroyer, and five chil-

dren. Letters of administration on his estate were granted to the widow on December 22, 1942. An inventory and appraisement of the personal estate amounting to $5,441.42 was made on December 28, 1942, but was not filed until March 11, 1943. The personal assets may be classified as follows: household goods, farm machinery, and livestock, $1,319.60; Federal Farm Loan Corporation bonds, $1,700; United States savings bonds, $1,050; notes and judgments, $607.30; bank deposits, $651.05; and other miscellaneous items, $113.47.

The widow elected to retain as her exemption certain household goods, farm machinery, and livestock of the appraised value of $500, and on January 7, 1943, the appraisement was presented and confirmed nisi 15 days. On January 14, 1943, Ernest Shroyer, a son by a former marriage, filed exceptions to confirmation absolute, the only reason assigned being that the property was grossly undervalued. A hearing was held on June 22, 1943, at which the principal testimony presented to sustain the exceptions was that of exceptant himself. He is 34 years of age and resides in Stewart Township where he is employed in farming, although a part of the time he is employed as a laborer by the Baltimore & Ohio Railroad Company. His father remarried in 1916 when Ernest was about seven years of age. Having resided with his father and stepmother until recent years, Ernest was familiar with substantially all of the principal articles selected by her as her exemption. The widow's appraisement contains about 69 separate items and Ernest has placed a value on about 41 of them. The value of these items, including the value as fixed by the appraisers on the remaining items, makes a total of about $1,100, or more than double the appraised value. We do not propose to discuss in detail the value of each article as fixed by exceptant, but to illustrate Ernest says that a red heifer appraised at $30 was

worth $60; that 11 sheep appraised at $44 were worth $88; that a bay mare appraised at $65 was worth $125; that a sorrel mare appraised at $100 was worth $180; that a grain drill appraised at $12 was worth $90; that a wagon and box appraised at $5 was worth $40; that a mower appraised at $1 was worth $25; that a hay rake appraised at $2 was worth $20; that a spring tooth harrow appraised at $3 was worth $20; and that various other small items were worth several times their appraised value. The grain drill is 22 years old and out of repair. The wagon is about the same age and the mowing machine is about twenty years of age and also out of repair. There is evidence that most of the other machinery and household goods are very old.

The only other witness called by exceptant was Jacob Shroyer, his uncle and a brother of decedent, who placed a value on a few items only. He says that the red heifer was worth $55, the sheep $99, the bay mare $125, the sorrel mare $150, the wagon $25, and the rake $10 or $15. These values as a whole are almost double those fixed by the appraisers.

There is no precise or inflexible rule as to the amount of knowledge a witness must possess in order to qualify him to testify as to the value of property. The standard of qualification is usually not fixed very high. Particularly is this so, where, as here, it is sought to determine the value of household goods, farm machinery, livestock, and other articles used on the average farm. If the witness has had the opportunity of forming a correct opinion, ordinarily he should be permitted to express it. Of course, the weight to be given his opinion is an entirely different matter. This will depend on his experience in buying, selling, or otherwise dealing in the type of property in question, his means of forming an intelligent and correct judgment, and any bias interest or prejudice he may have. These matters are usually developed on cross-examination, not for the

purpose of disqualifying the witness altogether but for the purpose of reducing the weight of his testimony. It is clear that exceptant was a competent and qualified witness, but that he was also an interested witness. It is doubtful, however, whether the other witness did not actually disqualify himself when he insisted upon fixing the values at the present time, and in some instances at what he was willing to pay, rather than expressing an opinion as to the fair market value at the date of death. Even if his testimony is considered we are of the opinion that the evidence is insufficient to warrant us in setting aside the widow's appraisement.

It was the duty of the widow, as administratrix of the estate, to have the personal property appraised, and after doing so she had the right to select therefrom property of the value of $500 as her exemption. The Fiduciaries Act of June 7, 1917, P. L. 447, sec. 12, as amended, provides, in part, as follows:

"The widow, if any, or if there be no widow, or if she has forfeited her rights, then the children forming part of the family of any decedent dying, testate or intestate, within this Commonwealth, or dying outside of this Commonwealth, but whose estate is settled in this Commonwealth, may retain or claim either real or personal property, or the proceeds of either real or personal property, belonging to said estate, to the value of five hundred dollars; and the property so retained or claimed shall not be sold, but suffered to remain for the use of the widow or children. It shall be the duty of the executor or administrator of such decedent to have the said property, if personal, appraised and set apart to said widow or children by the appraisers appointed to appraise the other personal estate of the decedent; or, if real, then by two appraisers to be appointed by the orphans' court, who may be the same persons appointed to appraise the personal estate. . . ."

It is to be noted that personal property retained by the widow is to be appraised and set apart to her by the appraisers appointed to appraise the other personal estate. The court has no authority to appoint appraisers except when the appraisers of the other personal estate are unable to make the appraisement. In this estate both appraisements were made at or about the same time by the same appraisers. They were chosen by the administratrix who is also the widow, but there is nothing in the record to indicate that they were partial in her behalf. Both appraisers are farmers residing in the same community where decedent resided, and Mr. Younkin seems to us to be especially well qualified for such duties. Should we, then, set aside an appraisement made by two disinterested and qualified appraisers on the testimony of exceptant and his witness that the property is worth substantially double the amount of the appraisement? The court has no power and authority to fix the value on the testimony presented. The judgment of the court cannot be substituted for that of the appraisers. The law does not so provide. In Vandevort's Appeal, 43 Pa. 462, exceptions were filed to a widow's appraisement and the court referred the matter to an auditor who took testimony and made a report to the court increasing the value of certain items. The lower court confirmed the report of the auditor, but on appeal to the Supreme Court, Woodward, J., says (p. 466):

"What is fatal to the decree is that it substitutes a valuation by an auditor for that of the appraisers provided by law. These appraisements of a decedent's goods are to be made, upon inspection and examination, by men sworn to exercise a sound judgment, not by an astute lawyer on testimony brought before him. Whether the appraisers are well or ill posted in principles of political economy, whether they govern themselves by cash or credit values, they are nevertheless the legal judges of the goods which a widow takes for her $300."

If there exists such evident undervaluation as to suggest fraud or collusion, the court has the power and authority to refuse absolute confirmation of the appraisement, but then the matter must go back to the same appraisers, the tribunal set up by the statute to fix the values. No fraud or collusion has been shown here. There is some testimony tending to show that the appraisers fixed the values low in order to reduce the inheritance tax, but both appraisers deny this and, in effect, reaffirm the values stated in the appraisement. Taking the evidence of value as fixed by the appraisers on the one side and the evidence of value as produced by exceptant on the other, the weight is clearly on the side of the former.

It may be that there is a weakness in the statute which permits an administratrix to appoint appraisers to value property which she may retain as widow. In this estate the class of property from which she took her exemption was appraised at $1,319.60, and, therefore, she took less than one half of it. There is no evidence to indicate that the appraisers knew of any articles which she desired to retain until after all of them were appraised. Then, too, all the authorities agree that exemption acts have been conceived in a spirit favorable to widows and that they should be administered in that same spirit. The judgment of the appraisers is somewhat analogous to the verdict of a jury, and unless the value of the property which the widow elects to retain is fixed so low as to shock the conscience of the court the appraisement should not be set aside.

## Decree

And now, July 12, 1943, the exceptions to the widow's appraisement are overruled and dismissed, and the appraisement is confirmed absolutely.